Good morning, Your Honor. Jason Singleton, appearing for appellant. Many of the points that I wish to illuminate, particularly in reference to the standing issue, were raised and quite well addressed by Judge Henderson in the active response group opinion. I would assume the Court's had an opportunity to review that opinion, so I won't retrench the same ground. There are, however, a few salient points that I wanted to raise in reference to the standing issue. The Canned Spam Act makes it a violation to send or attempt to send emails which violate the Canned Spam Act. Adopting the rule below by the District Court would place the burden of avoiding spam on the Internet access provider rather than where it is appropriately placed by the Canned Spam Act on the Internet marketer. Again, looking back at the opinion by Judge Henderson, it doesn't appear that any Internet access provider is ever going to be able to look at a group of 5,000 or 10,000 emails out of the 100,000 or million that they get each day and be able to show a specific, individualized, significant harm from that particular group of emails. As a result, the Canned Spam Act would be eviscerated. No IAP is going to be able to enforce the Canned Spam Act. Azugul, when they hire a spammer to send out 12,000 emails to an Internet access provider such as Aziz, and there are no opt-out links, there's no physical address to unsubscribe, that is harm to Aziz because Aziz's customers cannot themselves opt out from receiving those emails and thereby ameliorate the tidal wave of spam that Aziz sees every day. So we have our recent case of Gordon v. Buttermundo, right? Yeah. And that's sort of our first attempt at trying to give some meaning to adversely affected. Yeah, I did have a few points that I wanted to raise in reference to that case. Right. Now, you know, in that case, the panel could have ended its discussion of the standing issue once it decided that Gordon was not an Internet service provider. Indeed, that was But the court went on, nonetheless, and it's a full three-judge opinion, and it's entitled to our deference. Yeah. And it's the law of the circuit, but they go on to define what they mean by adversely affected, which seems to, on the one hand, set a pretty significant burden. But on the other hand, it does caution that it's not ruling out the possibility that with respect to legitimate Internet service providers, that they may well be able to show some harm to allow them to have standing under the statute. Did SIS have an efficacious filtering system in place? They did, Postini. And they turned it off. That's actually contested in the record, Your Honor. Well, I will assume, hypothetically, they turned it off. Would turning off your filter in order to perfect your status as a plaintiff be a kind of an invited tool? It would not for two reasons, Your Honor. First, there are reasons to collect some spam. You have to have a sample of the spam to be able to better configure your spam filter. So unless you have an idea of what's coming through, you don't know what Boolean operand words to put in your search software to be able to filter out the spam that you want to keep out. Second, if you do bounce the e-mails, in other words, you just close it, so they just drop, then you're telling the spammers which accounts are active and which ones are inactive. Well, we certainly don't want to be in a position of telling the spammers which accounts are live. So there are legitimate business reasons for doing this. Getting back to the Gordon case, Judge Payaz, as I read it, it said that if there is operational or technical impairments, and, two, and then later on they say, well, if it's a well-recognized Internet access provider, that standing would be presumed. Well, so I was a little confused. It seems to me that they're offering two different rules. If you're a small or medium-sized Internet access provider, you have one set of standing rules. And if you're a large Internet access provider, you'd have a different standard. And it seems to me the small or medium-sized Internet access providers are less able to handle the onslaught of spam from the Internet marketers. So it seems inequitable to me that you'd have two different rules for large or small Internet access providers. Well, the opinion talks about legitimate ISPs, and I gather here that that's not an issue. That's correct, Your Honor. The other problem I have with the Gordon opinion is the phrase operational or technical impairments is no more descriptive or insightful than the phrase adverse effect in the statute. I mean, I have to ask myself, what does that mean? Does that mean that as-is clients can't opt out? Does that mean a directory harvest? It's no more descriptive than the language that's in the statute to begin with. So while it looks good on paper, as practical application, it's not that great. So what does the record show that substantiates your claim that you were adversely affected by this spam? As-is pled, alleged, and provided evidence in opposition to summary judgment of a directory harvest. That's an alphabet attack whereby the addresses are harvested by a hacker and then spammed to. That can be found at Volume 3, Excerpts 590, 591, and Volume 4 at 607. Now, the experts did, you know, they have different opinions on this, as experts always do. But nonetheless, a directory harvest is very clearly a violation of the Can-Spam Act and very clearly adverse to as-is Internet. How? How? When a hacker comes in and steals all of your client's e-mail addresses and then starts spamming to them without permission, that's adverse. In addition to that. Does that mean that you're going to get, you know, that there were complaints from your customers? There were complaints generally about mortgage spam, but there were no complaints specifically that we could delineate as attributable to these specific e-mails. But no one wants their server hacked and all the e-mail addresses harvested and then used to send unsolicited commercial e-mail. It's very clearly a violation of the Can-Spam Act. In addition to that, there was evidence that, as with any Internet access provider, as-is is spending $400 to $500 a month on spam filtering. It consumes staff time. They have to constantly configure their spam filter. If you think about it, as-is has to analyze every single e-mail that comes through of some 200,000 a day, and they have to decide whether that e-mail is going in the trash bin to be stored or whether it's going on to the customers. That's adverse effect in itself. I know our time is short, so I wanted to move on to the other issue of conscious avoidance of knowledge. Let me ask you a question on that. Sure. Is there any evidence in the record to suggest that Azegel knew or should have known that its third-party vendor was providing false leads? There is. There's two groups of facts, and each group of facts raises an inference, and when you put those two inferences together, it does lead to that conclusion, so let me share that with you. At page 50 and 51 of our opening brief, we cover very clearly that there was evidence that the low-rate advisor's site had been stolen and spammed to for quite some time, in fact, and also that Azegel was quite aware of this fact. All right? Second, there's also a clear inference that Azegel knew about the W-Mort site where the Bruce Wolf fictitious information was entered. When Azegel knew that the low-rate advisor's sites are being stolen and spammed to, and then you also add in the inference that they knew about this W-Mort site, the logical conclusion is that they knew that these leads were being generated by spam. I mean, keep in mind that the industry at this time in 2005, it was the wild, wild west. If you indiscriminately hire vendors without vetting them and pay them cash in advance to send e-mails, it's not just a possibility you're going to get spammed, it's a near certainty. It's just not a coincidence that the site that generated the lead was almost an exact copy of Azegel's own copyrighted low-rate advisor's site. In fact, after the Bruce Wolf information had been entered and the lead sold to Quicken Loans, Quicken Loans then sends an e-mail right off to the fictitious Bruce Wolf, saying, thank you for contacting lowratedvisors.com. Azegel had identified that lead as coming from low-rate advisors to Quicken Loans, who then did the same back to As-Is or Bruce Wolf. Now, how is it that they knew that this lead came from a site that was identical to their own copyrighted site? The inference is they knew exactly where this lead was coming from. If that's true, and we also have the inference that when these sites are stolen and spambertized to, that those two inferences lead to the conclusion that they knew the inference is not that something was fishy that put them on notice. The correct inference is that they knew. They knew where these leads were coming from and that they were being generated via spam. I'd like to reserve. I've got four minutes left. Why was the court wrong in holding that Azegel didn't procure? Well, procure is a, for lack of a better description, a term of art under the statute. And then there's a definition for a procure, which says consciously avoids knowing and so on and so forth. And if you look at the legislative history, the actual standard offered in the Senate report and Senator or Representative Dingell's speech, the only thing that's required is that they do nothing to vet. They do nothing to look. You cannot go around hiring Internet marketers and affiliates to send e-mails on your behalf and look away and not ask what is it that you intend to do to comply with the act. That in itself imposes vicarious liability. You allege Azegel consciously refused to know? There was substantial evidence, if you read the district court's order and the citations to the record, substantial evidence. In fact, the person who managed that account, I asked him at deposition what is it they did to vet their affiliates, and he says nothing. So there's substantial evidence of that fact. If there are no other questions, I would like to reserve a few minutes for rebuttal. Yes, sir. Thank you. Good morning. Hank Burgoyne of Cronenberger Burgoyne on behalf of Azugel Ads. And I'd like to reserve a couple minutes as well, if I may. Unfortunately, I find myself at the outside here having to spend an unfortunate amount of time doing what I feel like we've had to do at every stage of this case, which is correct some really graphic misrepresentations as to the facts. So I'm going to recharacterize a few things with reference to the facts as we find them proven by evidence in the record and I think very well summarized in our papers. On the one side of this case, we have ACES, which its litigation efforts have been described by Judge Chen here in the Northern District as part of a business plan centered on a litigation strategy to recover statutory damages independent of ACES' Internet business. What ACES does, when its former customers leave, rather than deactivate their e-mail accounts, as those customers would presume and as was ACES' policy up until sometime in 2005, it leaves those accounts open so that all e-mails sent to those accounts, personal e-mail from family, friends, e-mail that might contain financial information, bank information, medical information, also commercial e-mail, continues, unknown to those customers, to flow through to ACES. ACES channels all this e-mail into a common mailbox. It boxes up the contents electronically and sends them to its attorneys at the Singleton Law Group, with whom it had an agreement before it started doing this, to work. Singleton takes those e-mails, dumps them into what Singleton does not do. Sotomayor. Every bit of it. In the district court record? Every bit of it. And every bit is in the record before this Court. ACES takes those e-mails, having dumped them into its spam database, and it has its personnel review them, look at them, search them, sort them, for the specific purpose, the specific purpose of bringing lawsuits. At this point, there's tens of millions by counsel Singleton's admission of e-mails in this database. Now, if you're saying to yourself that sounds like a violation of those former customers' privacy, it is, undoubtedly, of whatever privacy policy ACES had in place at the point. But I think much more importantly, it's a violation of the Electronic Communications Privacy Act. On its face, a violation of that act. To make matters worse, when we deposed folks who worked for Singleton, they said they'd never even been required to sign confidentiality agreements of the sort that any law firm has its personnel sign. Singleton designated the e-mails highly confidential, attorney's eyes only, but we deposed one contractor who had full access to all these e-mails who wasn't even asked to sign the court's protective the attachment to the court's protective order. And the court one interesting thing about this that the court understood, ACES has an external service called Postini. They provide a range of services, including the filtering of commercial, bulk commercial e-mail, now, not unlawful e-mail. Postini's filter doesn't know lawful from unlawful, but it uses certain parameters to identify what it considers to be bulk commercial e-mail. It stops them, drops them in a box, and lets users, ACES end users, actually go to Postini's site and look at the e-mails, decide if they want to receive them. ACES has to pay Postini on a per-account basis, which, contrary to ACES's representations, the per-account fee actually went down during the course of the alleged conduct. ACES actually has to keep affirmatively paying Postini on a per-email-account basis to keep those addresses active, so that e-mail sent to these former customers continues to flow through. What's more, as the Court pointed out, ACES then goes in, and this is plainly established as a record, admitted by Nella White, the president of ACES, they go in and if there's no question about this, they affirmatively disable all the filtering capacity at the Postini level, such that all the e-mails sent to these former customers flows through to this box, provided to Singleton, so that his employees can root around in them. All of this is firmly established in the record. There's no question about any of it. To speak for a moment about adverse effects, this Court spoke very clearly in Gordon to the nature of adverse effects as they are intended under the statute. And they do not include, this Court was very clear, costs of doing business incurred by any legitimate services provider. Now, ACES's evidence in regards to its supposed adverse effects is can be suspected on a number of grounds, I think the primary one being that every time ACES talks about adverse effects it suffers, it talks about adverse effects from, in quotes, spam. It's not saying from commercial e-mail. It's certainly not saying from unlawful commercial e-mail. And it's most certainly not saying that any of these effects relate to unlawful commercial e-mail at issue in this case. The Court put a finger right on it. Sotomayor, how can a legitimate ISP ever establish standing under, it seems like the statute without any meaning. Well, I think as ACES itself points out in its, I believe it's its reply to our opposition to its appeal on fees, there are legitimate companies who are bringing scores of these suits, as ACES points out, AOL and Microsoft and Earthlink. I know of one of the larger verdicts was on behalf of MySpace. I know a lot about it. Some folks I used to work with actually brought that case on the plaintiff's side. That case was brought in response to consumer complaints regarding an abuse of the MySpace platform to send commercial advertising, which, and I think we should talk more about the preemption issue, because I think this is what this Court was talking to when it tried to describe the types of actions that it foresaw being brought by private plaintiffs, legitimate service providers, and folks who could demonstrate adverse effects. But one more thing to wrap up about ACES and its supposed adverse effects. None of them relate to supposedly unlawful email. ACES claims to have experienced server crashes. We talked to the folks who administer their servers. They say they've got no record of any of that. If there were server crashes, it didn't relate to emails of any kind that they could tell, and in any event, they never charged ACES to deal with them. ACES never paid for bandwidth spikes. The folks who administer its servers couldn't remember any, much less in connection with unlawful emails, much less these emails. ACES claims that its cost of using Postini is an adverse effect. That was a specific cost identified by this Court, as that incurred by any legitimate service provider. And in any event, Postini does a range of things. It filters out viruses. It provides a firewall, e-mail management services. There's no adverse effects here. Focusing for a moment now on the other one. Roberts, we don't, Your Honor, but I think that raises a very interesting issue. As this Court set up and described, I think, at great length in the Gordon decision, there are two aspects to private parties standing under Can Spam Act. One of them is two requirements, shall we say. One is that the party have been a legitimate provider of Internet access services. The Court's described that already. The second is that the party have suffered adverse effects. Focusing back on the first of those, that they be a legitimate services provider. Now, we agree. We stipulated that ACES is, in a context, a services provider. They appear to provide Internet access and e-mail services. That, though, I don't think is dispositive of whether or not they're a legitimate service provider here. As I mentioned, Judge Chen, who stayed another ACES case that we were involved in at the pleading stage until this case or a similar case, Gordon, was resolved. Judge Chen found that this is an independent business being operated by ACES for the specific purpose of generating fees, statutory damages, an independent business, independent of its Internet operations. What ACES is saying, essentially — In this record, though, the district court didn't make any such determination here. That's correct. But it is in a district court's order, which we've submitted to this Court, I believe, on judicial issues. It's not in this order. That's correct. It's not in the order of this case. What ACES wants this Court to hold is, essentially, that an organization, an entity, can provide Internet access services sufficient to satisfy the definition of an Internet access services provider, and be it even a small provider, can then go off and construct a monster business, which, if it — I mean, ACES has brought at this point 60 of these lawsuits. Singleton, working with another client who channels e-mails into the spam database, has brought six more, seeking tens and tens of millions of dollars in damages This case, for example, alleged a grand spam conspiracy against 20 different parties. The reason Azugel's the only one here is because everybody else settled out. The figures are sealed as to how much money, but we can imagine, if left with a choice of defending a million-dollar lawsuit or settling from some five, six figures, what's a small company going to do? That's ACES's game plan here. Judge Chen, who I think this issue was specifically teed up for, recognized that. This is, I think it's fair to say, a grand abuse of this Act. There's no way that Congress intended that private party standing be used by even legitimate providers to construct businesses based upon seeking statutory damages, where there's no customer complaints, no damage, no — this actually, what ACES does here, subverts its role as an Internet access provider. It's violating its privacy agreement with users, which, unfortunately, is not part of the record. More than that, it's violating the Electronic Communications Privacy Act. It is subverting its duty to its customers in order to carry on this business for the pecuniary benefit of ACES and no one else. To get back to the focus on your client, didn't your client have reason to know that the leads that was being provided by its vendor were bogus? Absolutely not. And let me start by, I think we need to get back here to the definition of procure. And we're talking here not about procuring marketing leads, but procuring emails. Procure under CAN-SPAM, the definition, means intentionally to pay or provide other consideration to or induce another person to initiate such a message on one's behalf with actual knowledge or by consciously avoiding knowing whether such person is engaging or will engage in a pattern or practice that violates this chapter. You have to know or be consciously avoiding knowing that this person sends unlawful emails when you hire them to generate leads for you. In this context, and one of my favorite parts of the district court proceeding on this case was when Judge Spiro, at the hearing on summary judgment, cut off plaintiff's attorney and said, I hate arguments like this, where parties are throwing out scattered evidence tied together with wild speculation and hypothesis when we know what actually happened. Azugel received this lead in bulk with hundreds of others from a company called Seamless Media, with whom Azugel, with who had a contract with Azugel to get leads by means of publishing on the Internet. And it wasn't just for email, it was banner ads and websites and web, all these things. Seamless has tools available to generate leads. The contract is very specific. The leads have to be generated by lawful means. And Azugel is to be indemnified by Seamless for violations of the agreement. Azugel, of course, works with big blue chip companies like Blockbuster and Quicken Loans, who require in their agreements with Azugel that leads provided to them be generated by lawful means. At the time this misconduct took place, Azugel had one of the best compliance programs of any Internet marketer, ad network as they're called. This lead was generated by Seamless, which had a spotless reputation at that time in the industry. Azugel had them sign the contract that guaranteed that they wouldn't violate any laws. There was no information in the public record in Azugel's possession anywhere that would have suggested that leads coming from Seamless were other than totally legit, bona fide, generated by lawful means. As a result of all of what's happened here, Azugel received – this case comes out of Azugel receiving one sales lead of the hundreds of thousands it processes in a given month and of the hundreds it received from Seamless. One sales lead that Azugel received and passed on to others. That sales lead came from a totally legitimate provider who in turn appears to have received it from a totally legitimate provider. No information that they were in any way involved with violating the law. Who received it perhaps from another party, and there may have been other parties in the chain. Somewhere out there, Nella White couldn't even specifically remember the e-mail or the website that this – that she entered – that she got this link to or entered this lead into.  One sales lead from a legitimate provider. As a result of this, Azugel was sued by Quicken Loans. That's in the record. Azugel ended up having to sue Seamless. That's also in the record. Had to terminate their relationship with them. Azugel suffered reputational harms. Attorneys fees in all of these actions. Well in excess of a million dollars. One sales lead. Which really leads me to – I think brings us back to the purposes of canned spam and finds me wanting to ask the question, who here suffered the harm? Canned spam, as this Court was clear in Gordon, was not designed to stamp out commercial e-mail. To the contrary, it was designed to foster the growth of that vehicle, but to impose a code of conduct that would regulate what were recognized and what are certainly recognized by companies like Azugel, which fight like heck to stomp this stuff out, as abusive practices that existed in certain parts of the industry. Congress was specifically concerned about over-regulation of commercial e-mail, especially by States and more than that by private plaintiff's attorneys, who, as this Court described, would hear the siren song of plaintiff – of statutory damages and file suit. So this – so Congress did two things with respect to canned spam. One is it put in very strict, narrow as this Court has described them, private party standing restrictions. That's the must be a legitimate service provider, must have suffered adverse effects. I don't – I don't know – I don't think the statute actually says legitimate, just that it has to be an ISP. That's right. I think that's right. And this Court has interpreted that to mean, of course, a legitimate ISP, which I think is beyond common sense. The other thing – But here you stipulated that we have an IS – that ASIS is a – is a ISP. What we stipulated to you specifically, Your Honor, was that ASIS appeared to perform Internet access services in an unrelated context, but our contention always was, and still is, that ASIS quite clearly operates a separate business. So the – Well, it seems that that stipulation gets them beyond the first prong of the standing inquiry. I – I – Your Honor, I don't think it does. I mean, I think in the same way that someone can run a legitimate car wash – I mean, the fact that they may not be legitimate might affect one's determination of whether they suffered harm. I – I think, Your Honor, it goes to – I think, Your Honor, it – it goes to both. I mean, this Court in Gordon, and I'm not going to recap – Your Honor, under this Court, this Court was very specific – specific that the service provider aspect of standing wasn't a throwaway. We were looking for legitimate companies. Now, granted, the facts of that case are – are totally distinguishable. Right. There you're talking about a company that really didn't appear to legitimately be providing services. You're almost up with your time. Well, thanks. Well, I'll tell you what. The final point I'm going to make, and I hope – I hope that we can come back to it a little bit at the end, is – is the – the preemption point, which I think relates to the California claims here. I think the district court made a very important point that, by not beginning to prove any mental state that would speak to a tort or fraud, no damages, no consumer complaints, this seemed like the kind of thing that was preempted in any event under the State law. Thank you. We have a rebuttal. And this is going to be by Mr. Grabowski. Yes, Your Honor. Thank you. I'd like to correct a couple of issues. First, Judge Biro was the lower court judge in this case, not Judge Chinn. Judge Chinn apparently had a different case. Different case altogether. Totally different issues. Other issue – issues that need to be corrected. An ISP is defined in the statute. It's defined, and you're sent to, I believe, Title 45 of the Telecommunications Act, which defines it. There's a provider package of Internet services to consumers. And that seems to get overlooked a lot. It doesn't – doesn't go into the – the changes that the Gordon court considered as much. That's not ambiguous language, so I think it needs to be considered closely. A lot of opponents' arguments are really based on what happens after these emails are sent and received by the ISP, which is to some extent irrelevant. This – this statute is – makes it a violation to send these emails, not – not what you do with them after you receive them and start processing. One of the misconceptions that he made was that these emails weren't filtered. These emails were filtered by Postini, and all you have to do is check the headers of the emails, which we point out how to do in the – in the record, and you'll see the ratings there by Postini of what – of what rating – spam rating these emails were getting, virus ratings, et cetera. So these emails were rated. They went to a message center. Message center is part of Postini. And from there, they were transferred on for processing as evidence. That hardly can create a basis for – for eliminating standing. Processing and collecting evidence for – can't destroy standing. And that's basically what the opponent is arguing here. The opponent also makes an argument that the purpose of the Can-Stamp is regulation to create a regulatory environment for commercial email. The Can-Stamp Act is very specific. It's deterrence. Penalties brought by both the FTC, the State Attorney General, and those provided for an intended to deter sending certain types of emails that are in violation. And to that point, the emails in this case are in violation of almost every section in 7704, which defines the violations of the statute. False headers. They were stolen accounts. Misleading things. They used a directory harvest. Almost every way you can violate the Act, these emails violated the Act. And they seem to try to want to gloss over the real issue here, that these were sent to a valid ISP. They were serious violations. And they ultimately caused harm. I mean, they had to process these things. They had to check them. They had to go through in detail, through the thing, to even identify what was wrong with these things. Well, you know, adversely affected seems to suggest something more than regular doing business as usual. Well, the business of an ISP is to deliver emails to their customers. Valid emails. It's not to filter emails. This is a burden that's been placed on the ISPs. And it was one of the reasons the Can-Spam Act was written. If you read the legislative history, they clearly saw an onslaught, a continuing onslaught of emails, increasing costs to both the ISPs and the consumers. That's what's happened. Sixty billion emails are sent every day. All right. You're over your time. Thank you. Thank you very much, Your Honor. Thank you. Matter submitted.
judges: Carney, Goodwin, Paez